## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

United States of America,                                  Case No. 23-cr-236 (JWB/ECW)

      Plaintiff,

      v.                                              **ORDER &**
                                                   **REPORT AND RECOMMENDATION**
Albert James Williams,

      Defendant.

This matter is before the Court on the Government's Motion for Discovery (Dkt. 15); Defendant Albert James Williams' Motion to Suppress (Dkt. 38); and Williams' Motion to Compel Discovery (Dkts. 50 & 51). This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

Defendant Albert James Williams is charged by Indictment with two counts of Possession with Intent to Distribute Cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); two counts of Felon in Possession of a Firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(8); and two counts of Possessing a Firearm in Furtherance of a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(A)(i). (Dkt. 1.)

Williams filed the Motion to Suppress on April 8, 2024, in which he challenges the February 1 and 6, 2023 search warrants related to the residence located at XXXX 88th Avenue N., Brooklyn Park, Minnesota (the "Residence"). (Dkt. 38.) Briefing on

the Motion was completed on May 1, 2024.  (*See* Dkts. 44 & 45.)  On July 26, 2024, Williams sought to supplement his Motion to Suppress to add a staleness challenge with respect to the search warrants, and the Court granted that request.  (Dkts. 56 & 58.)  Briefing on the staleness issue concluded on August 23, 2024.  (*See* Dkts. 59 & 61.)

On August 31, 2024, the Court held a hearing on the Motions.  (Dkt. 64.)  Mary Riverso and Thomas Calhoun-Lopez, Assistant U.S. Attorneys, appeared on behalf of the Government, and Dane DeKrey appeared on behalf of Williams, who was present at the hearing.  (*Id.*)

The two warrants at issue authorized searches of the Residence.  The first search warrant, issued on February 1, 2023, authorized a dog to sniff the Residence's front door. (Gov't Ex. 1 (Dkt. 39-1) (also referred to as the "Dog Sniff Warrant").)  The second search warrant, issued on February 6, 2023, was based in part on the results of the Dog Sniff Warrant and authorized law enforcement to enter the Residence and search it for firearms and narcotics-related evidence.  (Gov't Ex. 2 (Dkt. 39-2) (also referred to as the "Interior Warrant").)

Williams argues that probable cause did not exist to issue either search warrant. Williams first argues that the contraband-related tips provided by a confidential reliable informant ("CRI") were anonymous and uncorroborated, and thus failed to constitute probable cause.  (Dkt. 39 at 6-13.)  Second, Williams argues that the Applications failed to establish the requisite nexus between Williams' alleged criminal activities and the Residence.  (*Id.* at 13-19.)

Williams also argues that the affiant for the search warrants, Detective Cody Turner, committed a violation under *Franks v. Delaware*, 438 U.S. 154 (1978), when he included a sentence in the application for the Dog Sniff Warrant, but not the subsequent Interior Warrant, namely, "The CRI stated that Williams lives with his wife, [K.L.] and what the CRI believed to be multiple teenage and adult children." (Dkt. 39 at 3-4, 20-23.) According to Williams, Detective Turner included this statement to "provide the missing link between the contraband" and the Residence for the Dog Sniff Warrant and then deleted it from the Interior Warrant because "(1) he didn't need it anymore because he now had his nexus; and (2) to cover his tracks." (*Id.* at 22.) Williams seeks an order from the Court either striking this statement from the Application for the Dog Sniff Warrant or setting a *Franks* hearing where Detective Turner would testify regarding the discrepancy. (*Id.* at 22-23.)

In addition, as part of his supplemental briefing, Williams made a staleness argument on the basis that there are no dates provided in the Affidavits. (*See* Dkt. 59.)

## II.    LEGAL STANDARD

The Fourth Amendment protects the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. In *Florida v. Jardines*, the United States Supreme Court found that a dog sniff on the front porch of a house without a search warrant is an unlawful intrusion on the curtilage of a home. 569 U.S. 1, 6-7 (2013).

Ordinarily, searches pursuant to a warrant are reviewed to determine if the application and affidavit set forth probable cause for the search. *See Illinois v. Gates*, 462

U.S. 213, 236 (1983). "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 238). The task of a court issuing a search warrant is "simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238.

"Probable cause is a fluid concept that focuses on 'the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting *Gates*, 462 U.S. at 231). In reviewing the decision of the issuing court, the duty of the reviewing court is simply to ensure that the court had a substantial basis for concluding that probable cause existed. *See Gates*, 462 U.S. at 238-39 (citation omitted); *see also United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty as a reviewing court is to ensure that the issuing judge had a 'substantial basis' for concluding that probable cause existed, and we owe substantial deference to the determination of probable cause by the issuing judge."). "Judges may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a search warrant . . . .'" *United States v. Keele*, 589 F.3d 940, 944 (8th Cir. 2009) (quoting *United States v. Alexander*, 574 F.3d 484, 490 (8th Cir. 2009), quoting

*United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007)).

As to what this Court should consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to [her], 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citing *United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999), quoting *United States v. Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)); *United States v. Smith*, 581 F.3d 692, 694 (8th Cir. 2009) (quoting *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986)).

The proponent of a suppression motion on the basis of a Fourth Amendment violation bears "the burden of establishing that his . . . Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, 130 n.1 (1978).

### III.    SUPPRESSION MOTION

On February 1, 2023, Detective Turner, assigned to the Hennepin County Violent Offender Task Force - Major Crime, applied for a search warrant for trace evidence and the odor of illegal narcotics from the exterior door handle, door frame, and door seams of the front door of the Residence.  (Dkt. 39-1 (Gov't Ex. 1) at 1.)  Specifically, Detective Turner sought permission to enter the curtilage of the Residence and conduct a police canine narcotics detection dog sniff at the Residence to sniff the exterior door seams, door handle, and door frame of the front door, in order to determine the presence of illegal narcotics within the Residence.  (*Id.* at 3.)

The basis included in the Application for the issuance of the Dog Sniff Warrant included the following:

- Detective Turner had been working with a CRI, who had worked with law enforcement in the past and had provided names and addresses to him of suspects involved in distribution of narcotics and prohibited persons in possession of firearms in the Twin Cities metro area that had been independently corroborated by Detective Turner, as well as other local enforcement officers, and had been found to be true and correct.

- Detective Turner represented that the CRI had also provided accurate and reliable information that resulted in seizures of quantities of narcotics and firearms.

- According to Detective Turner, he had "been in contact recently with" the CRI, and learned from the CRI that a person they knew as "Lil Ride" "has been selling large quantities of cocaine and is in possession of multiple firearms."

- The CRI told Detective Turner that they are aware that "Lil Ride" is prohibited from firearm possession and that he always has a firearm on him. The CRI also stated that they had seen Lil Ride in possession of multiple firearms and in possession of "switches" that convert Glock handguns into machine guns.

- The CRI stated that "Lil Ride" has multiple older teenage or adult children that he provides firearms to as well. The CRI stated they are aware that "Lil Ride" used to live in St. Paul but recently moved. The CRI stated that Lil Ride "keeps multiple firearms in his home."

- The CRI provided Detective Turner an open-source social media account for the person they knew as "Lil Ride." Detective Turner viewed this open-source Facebook account and provided this information to the HCSO Criminal Information Sharing and Analysis Unit, who advised that "Lil Ride" and the social media account are tied to a male named Albert James Williams. Detective Turner viewed booking photos of Albert Williams and saw that he was an exact match to profile photos on the social media account named "Lil Ride" that the CRI provided. In addition, Detective Turner showed an unmarked and unlabeled photo of Williams to the CRI, who confirmed it was "Lil Ride."

- A criminal history check on Williams showed that he is prohibited from firearm possession by multiple out of state felonies, including multiple convictions for reckless discharge of a firearm and felony controlled substance crimes.

- Through the use of court authorized electronic surveillance on the Facebook account provided by the CRI, Detective Turner was able to determine that Williams has been accessing that social media account through Comcast Internet services, which listed the account to a K.L who lives at the Residence. According to Detective Turner, he "spoke with this CRI and they advised that K.L. is 'Lil Ride's' wife. The CRI stated that Williams lives with his wife, K.L. and what the CRI believed to be multiple teenage and adult children."

- In addition, the CRI provided information that "Lil Ride" had a party house and a store front in St. Paul that he uses as a front to distribute cocaine and conceal firearms. The CRI provided an address for the place as being located in a strip mall located at XXX 7th Street East, St. Paul.

- Detective Turner did a Google Search and pulled up a strip mall building at that specific address, with two buildings side by side were displayed, which was shown to the CRI who claimed that the lower level on the building marked "XXX B" was the "party room" from where narcotics were concealed for distribution, and that "XXXA" was the clothing store (along with the party room) owned by Williams on 7th Street East.

- According to Detective Turner, the building labeled XXXB had a glass front door that appeared to have black plastic wrap concealing the interior of the door and the windows appeared to be blocked as well. The building labeled XXXA on the front door, appeared to be a clothing store named "BAC Boss Amiga."

- Detective Turner was advised by the CRI that Williams stores and sells narcotics out of XXXB.

- Based on Detective Turner's training and experience, he knew that people who are involved in the distribution of narcotics often times use firearms to protect their narcotics and the proceeds derived from the sale of narcotics, that firearms are valuable tools to people who distribute narcotics, that often times firearms are well hidden and are not disposed of quickly unless there is a threat of detection by police, and that people involved in the distribution of narcotics will keep firearms on their person or with them in their vehicle while conducting narcotics.

- Detective Turner also knew from his training and experience that people who are distributing narcotics and in possession of firearm oftentimes distribute/spread the narcotics, firearms and proceeds out between different locations under their control in order to prevent easy discovery and/or seizure by law enforcement, including their residence.

(Dkt. 39-1.)

On February 6, 2023, Detective Turner applied for the Interior Warrant seeking permission to search the Residence for evidence of firearms and narcotics-related evidence. (Dkt. 39-2 at 1.) The basis for the issuance of the Interior Warrant was materially the same as the Dog Sniff Warrant, except that it omitted any reference to Williams living at the Residence and included the positive indication of narcotics from the dog sniff, as well as surveillance regarding the Residence, as follows:

> Through the use of court authorized electronic surveillance on the aforementioned Facebook account provided by the CRI, your affiant was able to ascertain that Williams has been accessing this social media account through Comcast Internet services and listed the account a [K.L.] who lives at [XXXX] 88th Ave N, Brooklyn Park, Hennepin Co. Your affiant spoke with this CRI and they advised that [K.L.] is "Lil Ride's" wife.
>
> * * *
>
> Based off of this information, on 02/01/2023, your affiant drafted a night time/no knock curtilage warrant for the address of [XXXX] 88th Ave N., Brooklyn Park, Hennepin Co., Mn for a narcotics K9 to go on property and conduct an investigation utilizing a narcotics k9. This warrant was reviewed and signed by the Honorable Judge Rachel Hughey. Within the last 72 hours, your affiant contacted Detective Altendorfer and K9 partner "Molly" of the Ramsey Co. Sheriff's Office. Your affiant requested Det. Altendorfer respond to the address of [XXXX] 88th Ave N., Brooklyn Park to execute this court authorized K9 sniff warrant with his partner. At the conclusion of the investigation, Det. Altendorfer advised that K9 partner "Molly" indicated on the front door seam of [XXXX] 88th Ave N., Brooklyn Park, Hennepin Co., Mn to the presence of narcotics. Det. Altendorfer and K9 partner "Molly" are USPCA certified in narcotics detection for cocaine, heroin, meth, marijuana and MDMA.
>
> Your affiant is aware that the CRI states that Williams is currently trafficking narcotics, specifically cocaine, in the metro area. Your affiant was advised by the CRI that Williams was recently seen with firearms in his possession of which he is prohibited due to multiple felony conviction in Illinois for reckless discharge of a firearm and narcotics possession.

Your affiant conducted multiple surveillance operations at this location and noted that the neighborhood was very quiet in the early morning hours before 7am. Your affiant did not see any school buses or children outside at this time as well. Your affiant noted that as it got later into the morning near daybreak, multiple residence in the neighborhood would awake and begin their morning routines including going for walks on this specific street.

(Dkt. 39-2 at 3, 4.)

## A.    The CRI's Reliability

Williams argues that probable cause did not exist to issue either Search Warrant because the CRI's information related to drugs and guns was insufficiently corroborated to establish probable cause.  (Dkt. 39 at 6-13.)  This Court finds this argument unpersuasive.  The Eighth Circuit has found as follows with respect to reliance on informants for probable cause:

> When an affidavit in support of a search warrant is based upon information from an informant, the informant's "reliability, veracity, and basis of knowledge are relevant considerations—but not independent, essential elements—in finding probable cause." *United States v. Reivich*, 793 F.2d 957, 959 (8th Cir. 1986). The key inquiry in such cases is whether the information is reliable.  *United States v. Key*s, 721 F.3d 512, 518 (8th Cir. 2013).  Such reliability can be established through independent corroboration or the informant's track record of providing trustworthy information. *United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993).

*United States v. Faulkner*, 826 F.3d 1139, 1144 (8th Cir. 2016).

Here, both Affidavits state that the CRI provided accurate and reliable information in the past leading to the seizures of narcotics and firearms, and that the names and addresses of persons involved in narcotics distribution and as prohibited persons in possession of firearms by the CRI in the past had been independently corroborated by Detective Turner and other law enforcement officers.  (Gov't Ex. 1 (Dkt. 39-1) at 1-2;

Gov't Ex. 2 (Dkt. 39-2) at 2.)  This established the CRI's track record of providing

trustworthy information for the purposes of probable cause.  *See United States v. Gabrio*,

295 F.3d 880, 883 (8th Cir. 2002) ("The informant here had a track record of providing

reliable information.  Guida's affidavit stated that the informant had provided reliable

information on at least two prior occasions and had returned stolen property to law

enforcement officers.  This information was sufficient to show reliability.") (citations

omitted).  The CRI's track record as stated in Detective Turner's Affidavits, standing

alone, is sufficient to establish reliability for purposes of the issuing judge's probable

cause analysis.  *See United States v. Williams*, 10 F.3d 590, 593 (8th Cir. 1993)

("Information may be sufficiently reliable to support a probable cause finding if the

person providing the information has a track record of supplying reliable information, **or**

if it is corroborated by independent evidence.") (emphasis added).

However, citing non-binding authority from the District of Minnesota, Williams

argues that CRI's record of reliability must be detailed with specificity and supported by

"proof" within the Affidavit.  (Dkt. 44 at 1-2 (citing *United States v. Rios-Uscanga*, No.

16-CR-316 (RHK-KMM), 2017 WL 1534746, at *4 (D. Minn. Mar. 13, 2017), *R. & R.*

*adopted*, 2017 WL 1534745 (D. Minn. Apr. 26, 2017).)  But in *Rios-Uscanga*, the

"absence of such details" that undermined the probable cause determination related to the

nexus between the house to be searched and the contraband, not the absence of details for

a CRI's track record.  2017 WL 1534746, at *4.  Williams cites no binding (or even

persuasive) authority requiring corroboration of the CRI's track record, and the Court

declines to impose such a requirement in the absence of such authority, particularly when

doing so could compromise CRIs.  Further, Williams ignores Detective Turner's statement that the CRI provided information leading to the seizure of narcotics and firearms in the past.  This is sufficient to establish reliability.  *See Gabrio*, 295 F.3d at 883 ("Reliability may be found on the basis that past tips have led to seizures of contraband or other evidence.").

In any event, the Court also finds that the information the CRI provided about Williams was sufficiently corroborated.  In determining whether an informant's tip has been corroborated, even "**minor innocent activity** can suffice to establish probable cause."  *See United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (emphasis added) (citation and marks omitted).  Moreover, not every detail must be corroborated. *See Gladney*, 48 F.3d at 313 ("When an informant's information is at least partially corroborated . . . attacks upon credibility and reliability are not crucial to the finding of probable cause.") (marks and citation omitted).

Williams relies upon *Rios-Uscanga* for the proposition that the information from the CRI relied upon by the issuing judge in this case was not sufficiently corroborated by law enforcement.  (Dkt. 39 at 8-9; *see also* Dkt. 44 at 8-9.)  Setting aside the fact that corroboration is not required here due to the CRI's track record, Williams' reliance on *Rios-Uscanga* is unpersuasive given that the warrants in that case were not invalidated due to lack of informant reliability, but instead focused on whether there was a sufficient nexus between the place to be search and possible criminal activity.  *Id.* at *3-5. Williams stretches *Rios-Uscanga* too far to the extent he asserts it sets a standard for

determining whether a confidential informant is reliable for purposes of the probable cause analysis.

Although Williams ultimately concedes that the Court "can" find that the corroboration of minor innocent details can be sufficient, he argues the Court should not do so here because while Detective Turner corroborated two, non-contraband related details, he failed to corroborate more important information, including regarding the actual possession of firearms and switches and the selling of cocaine. (Dkt. 39 at 10-12.) However, this argument ignores the Eighth Circuit precedent that corroboration of minor details is sufficient and that not every detail needs to be corroborated. *See United States v. Keys*, 721 F.3d 512, 518 (8th Cir. 2013) (finding independent verification of type of car driven by suspect and suspect's residence were "minor, innocent details [that] can suffice to establish probable cause") (internal quotation marks omitted); *Gladney*, 48 F.3d at 313 ("When an informant's information is at least partially corroborated . . . attacks upon credibility and reliability are not crucial to the finding of probable cause.") (marks and citations omitted); *see also United States v. Finch*, No. 21-CR-157 PAM/ECW, 2022 WL 1110994, at *5 (D. Minn. Feb. 9, 2022), *R. & R. adopted*, 2022 WL 843937 (D. Minn. Mar. 22, 2022) (citation omitted).

Here, Detective Turner corroborated the CRI's information as follows: He confirmed the identity of Lil Ride as Williams through social media and criminal records and then with the CRI based on an unmarked and unlabeled photograph; discovered through court-authorized electronic surveillance that Williams was accessing the Lil Ride Facebook account  "through Comcast Internet services and listed the account to a [K.L.]

who lives at [the Residence]," where K.L. is the woman the CRI described as Williams'
"wife" and whom the CRI said Williams was living with (along with children); and
confirmed that the St. Paul street address where the CRI said Williams had a "party
room" where narcotics were concealed for distribution and a "clothing storefront"
comprised of a clothing store to the right of a building having a glass front door with
black plastic wrap concealing the interior, along with blocked windows.  (*See* Dkt. 39-1.)
This is more than enough for the issuing judge to find the CRI's information reliable.
The Court recommends against suppression on the grounds that the CRI's information
was not reliable.

**B.    Nexus to the Residence and Request for a *Franks* Hearing with Respect to the Dog Sniff Warrant**

Williams also argues that the Search Warrants lacked probable cause because they
failed to provide evidence of a nexus between contraband and the Residence because the
warrants lack any evidence that he owns the Residence, and because the sentence in the
Dog Sniff Warrant that "the CRI stated that Williams lives with his wife, [K.L.]" contains
a factual misrepresentation, which is missing from the February 6 Search Warrant
Application, and should be excised under *Franks v. Delaware*, 438 U.S. 154 (1978).
(Dkt. 39 at 13-25.)

Pursuant to *Franks v. Delaware*, a defendant may seek a hearing to challenge a
search warrant on the ground that the supporting affidavit contains factual
misrepresentations or omissions relevant to the probable cause determination.  *See United*

*States v. Daigle*, 947 F.3d 1076, 1084 (8th Cir. 2020).[1] "'However, in order to merit a *Franks* hearing, a defendant must show both (1) that the affiant 'knowingly and intentionally' made false statements or made them in 'reckless disregard for the truth' and (2) if the false information is excised (or the omitted information is included), the affidavit no longer establishes probable cause.'" *Id.* (cleaned up) (quoting *United States v. Arnold*, 725 F.3d 896, 898 (8th Cir. 2013), quoting *Franks*, 438 U.S. at 155-56). This "requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015) (citation omitted); *see also Franks*, 438 U.S. at 171 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."); *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998) ("A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing [under *Franks*]."). Moreover, "[a] *Franks* hearing must be denied unless the defendant makes a **strong** initial showing of deliberate falsehood or reckless disregard of the truth." *United States v. Freeman*, 625

---

[1] The majority of courts within this District have treated a motion for a *Franks* hearing as a non-dispositive motion. *See, e.g.*, *United States v. Hari*, No. CR181501DWFHB, 2019 WL 7041849, at *1 (D. Minn. Dec. 20, 2019) ("Motions for *Franks* hearings are non-dispositive and, therefore, reviewed for clear error.") (citation omitted); *United States v. Mays*, Crim. No. 19-75, 2019 WL 4565636, at *4 (D. Minn. Sept. 20, 2019) (collecting cases). Here, the Court includes the request for a *Franks* hearing with the Report and Recommendation, as opposed to the other non-dispositive motions, because it is intertwined with the Motion to Suppress.

F.3d 1049, 1052 (8th Cir. 2010) (internal quotations and citation omitted) (emphasis added).

Again, the difference raised by Williams is that the Affidavit for the Dog Sniff Warrant said that Williams lives with his wife, K.L., and what the CRI believed to be multiple teenage and adult children, while the Interior Warrant did not contain that statement. In particular, the Affidavit for the Dog Sniff Warrant states:

> Through the use of court authorized electronic surveillance on the aforementioned Facebook account provided by the CRI, your affiant was able to ascertain that Williams has been accessing this social media account through Comcast Internet services and listed the account to a **"[K.L.]" who lives at** [XXXX] 88th Ave N, Brooklyn Park; Hennepin Co. Your affiant **spoke with this CRI and they advised that [K.L.] is "Lil Ride's" wife. The CRI stated that Williams lives with his wife, [K.L.] and what the CRI believed to be multiple teenage and adult children.**

(Dkt. 39-1 at 2 (emphasis added).)

In comparison, the Affidavit for the subsequent Interior Warrant said:

> Through the use of court authorized electronic surveillance on the aforementioned Facebook account provided by the CRI, your affiant was able to ascertain that Williams has been accessing this social media account through Comcast Internet services and listed the account to a **"[K.L.]" who lives at** [XXXX] 88th Ave N, Brooklyn Park, Hennepin Co. Your affiant **spoke with this CRI and they advised that [K.L.] is "Lil ride's" wife.**

(Dkt. 39-2 at 3 (emphasis added).)

Williams argues that he is entitled to a *Franks* hearing on the basis of the omission of "Williams lives with his wife" from the Affidavit for the Interior Warrant. In other words, it is Williams' position that the omission of "Williams lives with his wife" from the second Affidavit (for the Interior Warrant) means it was false when Detective Turner

included the statement in the first Affidavit (for the Dog Sniff Warrant).[2]  (Dkt. 39 at 17

("But as discussed below, this sentence should be excised from the dog warrant because

it 'contains factual misrepresentations . . . relevant to the probable cause determination.'

Detective Turner wrote both warrants.  And both warrants are 99.9% identical.  The only

difference is this sentence.") (footnote omitted).)  In order to receive relief under *Franks*,

Williams must show that Detective Turner knowingly or recklessly made a false

statement.  *See Daigle*, 947 F.3d at 1084.  Here, the only concrete evidence provided by

Williams that the statement regarding living with his wife at the Residence was

intentionally false is that the statement was not included in the Affidavit for the Interior

Warrant.  (Dkt. 39 at 17, 21-22.)  In this regard, Williams offers the following theory:

> So how does that sentence from the dog warrant mysteriously disappear
> from the home warrant?
>
> It makes no sense other than it was done purposefully by Detective Turner.
> But why? Why put the sentence in the dog warrant but not the home
> warrant? Simple: because Detective Turner needed to establish a nexus
> between the contraband and the Brooklyn Park home for Judge Hughey to
> sign off on his initial, dog warrant. He knew the affidavit was lacking. He
> knew she wouldn't sign off. So he added in that sentence to provide the
> missing link between the contraband and the Brooklyn Park home. After all,
> if Albert lived there, then the CRI's statements would be more than enough
> to establish probable cause.
>
> And his plan worked. With that sentence, Judge Hughey signed off on the
> warrant permitting the dog to sniff the front door in hopes of detecting the

---

[2]    Williams suggests in his brief that K.L. is his "girlfriend" rather than his wife.
(Dkt. 39 at 19.)  But he does not argue that the statement "Your affiant spoke with this
CRI and they advised that [K.L.] is 'lil ride's' wife" was a knowingly or recklessly false
statement or seek a *Franks* hearing based on this statement.  Indeed, while K.L. describes
herself as Williams' "significant other" (Dkt. 39-3 ¶ 3; Dkt. 59-1 ¶ 3), she does not say
she is not his wife or is not married to him.

presence of drugs. And when the dog alerted, Detective Turner had all that he needed. That was his nexus: drugs on the front door of the house. So when he wrote up the second warrant for the home, he deleted the fabricated sentence about the CRI saying Albert lived at the Brooklyn Park home.

(*Id.* at 21-22.)  However, "[t]his type of speculation is insufficient to compel a *Franks* hearing."  *United States v. Turner*, 953 F.3d 1017, 1022 (8th Cir. 2020) (citation omitted) ("Rather than attributing the omission to an innocent mistake or negligence, Turner hypothesizes that the detective knew that providing the time frame would make the information stale and valueless.  This type of speculation is insufficient to compel a *Franks* hearing.").

As a starting point, Williams has not offered any evidence that he did not live at the Residence, and consequently has offered no evidence that the statement that he lived with K.L. was false.  To be sure, he offered two Affidavits from K.L. in support of his Motion.  (Dkt. 39-3; Dkt. 59-1.)  In these Affidavits, K.L. states under penalty of perjury that she is "Williams's significant other," that they have been in a relationship "off and on for about 20 years," that her current address is the Residence, and she was "in a relationship" with Williams while living in the Residence (as well as when living at her previous address).  (Dkt. 39-3. ¶¶ 3-5, 7; Dkt. 59 ¶¶ 3-4, 7-8.)  Notably, she does not state that Williams did not live with her at the Residence.  Indeed, K.L.'s statements actually support the statement that Williams lives with his wife at the Residence in Detective Turner's Affidavit in Support of the Dog Sniff Warrant.  Moreover, there is no evidence that Detective Turner did not believe in good faith, based on the CRI's representation, that Williams lived with K.L. at the Residence when he applied for the Dog Sniff

Warrant. A simple mistaken belief by Detective Turner is not a basis for *Franks* hearing.[3] *See United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) ("[N]egligence or innocent mistake is not enough to establish a *Franks* violation.") (quoting *United States v. Butler*, 594 F.3d 955, 961 (8th Cir. 2010)). For these reasons, Williams' request for a *Franks* hearing is denied.

Williams' request for a *Franks* hearing is denied for another reason, that is, there is probable cause to support the warrant if the challenged statement is excised. If a court determines that an affidavit in support of a warrant contains an intentionally false statement or false statement made with reckless disregard for the truth, the court must "set aside those statements and then review the remaining portions of the affidavits to see if what remain[s is] sufficient to establish probable cause." *United States v. Garcia*, 785 F.2d 214, 222 (8th Cir.), *cert. denied*, 475 U.S. 1143 (1986); *see also United States v. Snyder*, 511 F.3d 813, 816 (8th Cir. 2008) ("The defendant must then show that the affidavit would not establish probable cause if the allegedly false information is ignored or the omitted information is supplemented.") (citing *United States v. Reinholz*, 245 F.3d 765, 774 (8th Cir. 2001)). Here, the remaining facts connecting Williams to the

---

[3]    Williams appears to argue in his Reply that the Government wants the Court to consider facts that Detective Turner learned after execution of the Dog Sniff Warrant, and thus outside of Affidavit considered by the issuing judge, indicating that Williams did not live at the Residence. (Dkt. 44 at 4-8.) However, the Court does not read the Government's opposition to be making such an argument. Instead, the Court reads it as making a hypothetical argument as to how the statements in the Affidavits for the Dog Sniff and Interior Warrants could both be true and explaining why the "Williams lives with his wife" statement would be removed from the Affidavit for the Interior Warrant without triggering a need for a *Franks* hearing. (*See* Dkt. 40 at 10-11.)

Residence, and the likelihood that evidence of a crime would be found at the Residence, are as follows:

- The CRI stated they are aware that "Lil Ride" used to live in St. Paul but recently moved. The CRI stated that Lil Ride keeps multiple firearms in his home and always has a gun on his person.

- Williams is prohibited from having firearms as a convicted felon.

- K.L. is Williams' wife.

- Through the use of court authorized electronic surveillance on the Facebook account provided by the CRI, Detective Turner was able to determine that Williams had been accessing the "Lil Ride" Facebook account "through Comcast Internet services and listed the account to a '[K.L.]' who lives at" the Residence.

- Information from the CRI that Williams is engaged in narcotics trafficking.

- Detective Turner's knowledge based on his training and experience that people who are involved in the distribution of narcotics often times use firearms to protect their narcotics and process, that they are well hidden, and that people involved in the distribution of narcotics will keep firearms on their person.

- Detective Turner's knowledge based on his training and experience that people who are distributing narcotics and in possession of firearm oftentimes distribute/spread the narcotics, firearms, and proceeds out between different locations under their control in order to prevent easy discovery and/or seizure by law enforcement, where such locations include their residence.

(Gov't Ex. 1, Dkt. 39-1.)

Williams relies heavily on *Rios-Uscanga* for the proposition that there is no nexus between Residence and illegal activity for the Dog Sniff Warrant if the "Williams lives with his wife" statement is excised. In *Rios-Uscanga*, the court found that a warrant to search the home of a suspected drug dealer's girlfriend lacked probable cause because the court found "no assertion **or even suggestion** in the affidavit that the residence to be

searched [was the defendant's] home." 2017 WL 1534746, at *3 (emphasis added). The affidavit in that case "did not state that [the defendant] even stayed occasionally at the home, but only that it is 'listed' to his girlfriend" and "[w]hile the affidavit said Mr. Rios-Uscanga was seen entering and exiting, it did not allege that this observation occurred more than once," but no suspicious activity was observed that the time. *Id.* In addition, there was no assertion that the defendant's girlfriend was involved in any drug trafficking. *Id.* at 4. That said, the court also noted that law enforcement could have still established probable cause to search the house even if the defendant did not live there, providing a number of examples. *Id.* at *4 (citations omitted). The *Rios-Uscanga* court did not suggest that its list of examples was exhaustive.

"Probable cause exists when a practical, common-sense inquiry that considers the totality of the circumstances set forth in the information before the issuing judge yields a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (marks and citation omitted). Judges "may draw reasonable inferences" from the totality of the circumstances in determining whether probable cause exists. *See Keele*, 589 F.3d at 944 (8th Cir. 2009) (marks and citations omitted). Based on a common-sense inquiry and reasonable inferences, the Court finds that a totality of the circumstances yielded a fair probability that narcotics or firearms could be found at the Residence. Here, in contrast to *Rios-Uscanga*, the Affidavit states that Williams has been using a Comcast account connected to K.L. to access the Lil Ride Facebook account, where K.L. is associated with Residence. (Gov't Ex. 1, Dkt. 39-1 at 2.) While the Affidavit did not state that Williams'

20

personal presence was observed at the Residence, his digital footprint connects him to the Residence through that electronic surveillance.  (Gov't Ex. 1, Dkt. 39-1 at 2.)

In an attempt to undermine this link, Williams focuses on K.L.'s statement in her April 8, 2024 Affidavit that she had the same Comcast internet account at her previous home (Dkt. 39-3 ¶¶ 11-14), arguing that he could have accessed the Facebook account at K.L.'s previous home rather than the Residence (Dkt. 39 at 18).  However, when determining probable cause, the Court can only look at the contents of the Affidavit.  *See Solomon*, 432 F.3d at 827 (stating that when no evidence outside of the affidavit to a search warrant is submitted to the issuing judge, "only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.") (marks and citation omitted).  The issuing judge had no way of knowing that K.L. had moved to the Residence in September 2022 and carried her Comcast internet from her previous residence to the Residence.  Instead, the issuing judge had an Affidavit stating: "Williams has been accessing this social media account through Comcast Internet services and listed the account to a '[K.L.]' who lives at [the Residence]."  Williams has not challenged this statement as intentionally false or made in reckless disregard for the truth.  The issuing judge could reasonably infer from this statement that Williams accessed the Facebook account using the Comcast internet service at the Residence—and in fact would have no reason to think the Comcast internet service was used at any other location.  The Court will not engage in a mini-trial regarding where Williams accessed the Facebook account in the context of a suppression motion where none of the evidence Williams relied on was before the issuing judge and

Williams has not made a *Franks* challenge as to this statement. Indeed, notwithstanding Williams' argument that it was "just as likely" that he accessed the Facebook account at K.L.'s previous residence (Dkt. 39 at 18-19), "search warrants address probabilities not certainties, and therefore, the 'affidavit need only establish the probability of criminal activity' rather than proof beyond a reasonable doubt." *United States v. Chen*, No. 21-CR-250 (JRT/TNL), 2023 WL 3719467, at *6 (D. Minn. Mar. 9, 2023) (quoting *United States v. Brown*, 584 F.2d 252, 257 (8th Cir. 1978), *R. & R. adopted*, 2023 WL 3597904 (D. Minn. May 23, 2023) (cleaned up).

Williams also argues that, even if the issuing judge assumed he used the Comcast internet at the Residence, his use of the internet at the Residence does not mean he lived there. (Dkt. 39 at 18-19.) This argument ignores the fact that "[p]robable cause exists when a practical, common-sense inquiry that considers the totality of the circumstances." *Stevens*, 530 F.3d at 718. The statement describing the use of a Comcast internet account linked to K.L., who lived at the Residence, to access the Lil Ride Facebook account, in conjunction with the unrebutted statement in the Application that K.L. is Williams' wife, leads this Court to find that there is sufficient information in the Affidavit to reasonably connect Williams to use of the Residence for the purposes of probable cause.[4] *See*

---

[4] Again, while Williams asserts in his brief that K.L. is his "girlfriend," K.L.'s Affidavits do not say she is his girlfriend, do not deny that she is his wife, in fact describe Williams as her "significant other" that she has been in an "off and on" relationship for about 20 years, and do not deny that Williams holds K.L. out as his wife (or that K.L. holds herself out as Williams' wife). For purposes of the probable cause analysis, the Court will not ignore the statement that the CRI "advised that [K.L.] is 'lil ride's' wife" when there is no evidence to that K.L. is not Williams' wife, no evidence that the CRI did not think K.L. was Williams' wife, and no evidence that the CRI did not "advise[]"

*United States v. Sewell*, 780 F.3d 839, 846 (7th Cir. 2015) ("Here, it was entirely reasonable to infer that Sewell lived with his wife, even if only her name appeared on the lease. Many married couples live together, after all. And if he lived with his wife, then it was also entirely reasonable to believe that he operated his drug business from the home, as other drug dealers do.") (citations omitted); *see also United States v. Anderson*, 618 F.3d 873, 881 (8th Cir. 2010) ("Drug dealers commonly put their property in someone else's name to avoid detection.") (citation omitted). Williams' connection to the Residence, even with the removal of the statement that he lived there, coupled with the CRI's representations regarding his narcotics trafficking, and Detective Turner's experience that narcotics dealers keep their narcotics in multiple places, including their residences, leads this Court to find there was a fair probability that evidence of a crime would be found at the Residence. *See, e.g.*, *United States v. Ross*, 487 F.3d 1120, 1123 (8th Cir. 2007) ("[W]e have found probable cause to exist in cases in which officers have stated that in their experience such an inference is appropriate and in which a supporting affidavit also described a defendant's continuous course of drug trafficking activity."); *United States v. Tellez*, 217 F.3d 547, 549 (8th Cir. 2000) ("In this case there was evidence that [the defendant] was engaged in a continuing course of criminal activity, and we believe that it could fairly be inferred that he was keeping a supply of drugs and perhaps other evidence relating to his drug dealing in his home. Although, it is true that neither the informant nor the detective had actual knowledge that contraband was in [the

---

Detective Turner as stated in the Affidavit.

defendant's] home, absolute certainty was not necessary: a fair probability is all that is required."); *see also United States v. Carpenter*, 341 F.3d 666, 671 (8th Cir. 2003) ("As a matter of common sense, it is logical to infer that someone in possession of valuable contraband would store that contraband in a safe, accessible location such as his or her residence."); *United States v. Edwards*, No. 21-CR-255 (NEB/ECW), 2022 WL 4112436, at *18 (D. Minn. June 21, 2022), *R. & R. adopted*, 2022 WL 3536135 (D. Minn. Aug. 18, 2022), *aff'd*, 111 F.4th 919 (8th Cir. 2024). This is a second, independent reason to deny the request for a *Franks* hearing.

In sum, the Court denies Williams' Motion insofar as it seeks a *Franks* hearing because he has not satisfied either requirement for such a hearing.

## C. Staleness

In his supplemental memorandum in support of his Motion to Suppress, Williams raises a staleness challenge on grounds that it is impossible to discern from the Affidavit in support of the Dog Sniff Warrant when the events described by the CRI occurred because no dates or other temporal markers were provided. (Dkt. 59 at 1-2, 4.) The Government counters as follows:

> The Dog Warrant specified that the affiant had "been in contact recently with" a CRI. (Dog Warrant at 2.) The CRI said the defendant was at the time of the affidavit "selling large quantities of cocaine" and . . . in possession of multiple firearms. (*Id.*) The CRI also indicated that the defendant was then keeping "multiple firearms in [the defendant's] home." (*Id.*)

> The Home Warrant includes all of the foregoing, and adds that within the last 72 hours a canine alerted to the presence of narcotics at the front door of the residence. (Home Warrant at 4.)

(Dkt. 61 at 6.)  The Government also focuses the Affidavit's description of an ongoing narcotics operation and the continuous crime of illegally possessing firearms in the Residence, noting that the Eighth Circuit has held "'investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant do not necessarily make the information stale, and a lapse of time is least important when the suspected criminal activity is continuing in nature and when the property is not likely to be destroyed or dissipated.'"  (*Id.* at 7 (quoting *United States v. Ortiz-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017).)  The Government does not identify any information in the Affidavits tethering the CRI's statements about Williams' drug trafficking and firearms possession to any point in time.

"While a lapse of time between the observations of a witness and the issuance of a search warrant may render probable cause fatally stale, there is no bright-line test for determining when information is stale."  *United States v. Gettel,* 474 F.3d 1081, 1086 (8th Cir. 2007) (cleaned up).  "A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search."  *Ortiz-Cervantes*, 868 F.3d at 700 (cleaned up).  "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be considered."  *Gettel*, 474 F.3d at 1086 (cleaned up).  Indeed, "in investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale."  *United*

*States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (cleaned up); *see also Ortiz-Cervantes*, 868 F.3d at 700. Similarly, the Eighth Circuit has concluded that several-months-old information that someone illegally possessed a firearm was not stale because "individuals who possess firearms tend to keep them for long periods of time." *United States v. Neal*, 528 F.3d 1069, 1074 (8th Cir.2008) (citing *United States v. Kennedy*, 427 F.3d 1136, 1142 n.5 (8th Cir. 2005)).

The Court begins with the Dog Sniff Warrant. Williams is correct that the supporting Affidavit contains no dates regarding the events described. The evidence of criminal activity from the CRI provides as follows:

> Your affiant has **been in contact recently** with the aforementioned CRI. This CRI advised that a person they know as "Lil Ride" has been selling large quantities of cocaine and is in possession of multiple firearms. The CRI states they are aware that "Lil Ride" is prohibited from firearm possession and that he always has a firearm on him. The CRI stated that "lil ride" has a "party house" and a store front in St. Paul that he uses as a front to distribute cocaine and conceal firearms. The CRI stated that they have seen Lil Ride in possession of multiple firearms and in possession of "switches" that convert Glock handguns into machine guns. This CRI stated that "lil ride" has multiple older teenage or adult children that "lil ride" provides firearms too [sic] as well. The CRI stated they are aware that "Lil Ride" used to live in St. Paul but recently moved. The CRI stated that Lil Ride keeps multiple firearms in his home.

> \* \* \*

> In speaking further with this CRI, they provided the address of [XXX] 7th Street East, St. Paul for the businesses belonging to Williams. Your affiant did a Google Search and pulled up a strip mall building at that specific address. Two buildings side by side were displayed on the screen. Your affiant took a photo of these two buildings and sent them to the CRI. The CRI stated that the lower level on the building marked "[XXX] B" was the "party room" and "[XXX]A" was the storefront on 7th Street East, St Paul, Ramsey Co, Minnesota. "[XXX]-B" was a brick building with what appeared to be some type of apartment upstairs that is accessed by a door in between

26

[XXX]B and [XXX]A. This apartment above is uninvolved with this investigation at this time. Your affiant was advised by the CRI, after they viewed a photo of the front of the building provided by your affiant, that the brick building on the left with the door labeled "[XXX]-B" was "Lil Ride's" 'party room' where narcotics, specifically cocaine, were concealed for distribution. This glass front door appeared to have black plastic wrap concealing the interior of the door and the windows appeared to be blocked as well. The CRI advised that the door to the right labeled "[XXX]-A" was the clothing storefront that "Lil Ride" AKA Albert Williams owns along with the party room. This building, labeled [XXX]A on the front door, appeared to be a clothing store named "BAC Boss Amiga". Your affiant was advised that Williams stores and sells narcotics out of [XXX]-B.

(Govt. Ex. 1 at 2, 3.)

The Government points to the language in the Application providing that Detective Turner had "been in contact recently with" a CRI, arguing that "the word 'recent' according to the dictionary has a general, commonsense meaning 'of or relating to a time not long past.'" (Dkt. 61 at 9.) However, that recency dealt with when Detective Turner spoke with the CRI, not when the events described by the CRI occurred. Outside of the CRI's use of the present tense, indicating that Williams was engaging in narcotics trafficking and the possession of firearms, there is no information regarding the time of these events.

The Court has concern regarding the lack of any dates in the Affidavits. *See United States v. Button*, 653 F.2d 319, 324-25 (8th Cir. 1981) (finding no probable cause where affidavit relied on information received by the affiant "over the past six months" from a hearsay informant that the defendant was "currently supplying" narcotics and the only specific date contained in the warrant was the date the affiant had found cocaine in the garbage at the defendant's residence, which was the date on which the search was to

be executed).  The Court is also not persuaded by the Government's reliance on *Ortiz-Cervantes*, *supra*, because that case involved a set of 10 controlled buys, the most recent buy occurring hours before law enforcement applied for the warrant and the first buy occurring 8 months before the application, and other information supported a finding of probable cause.[5]  868 F.3d at 699-701.  On the other hand, Detective Turner stated that he spoke with the CRI "recently" and the CRI described an ongoing course of drug trafficking, including out of the "party house," which is somewhat corroborated by Detective Turner's (albeit undated) investigation of the "party house."  However, the Court need not and does not decide whether the information relied on was "stale" because the Court finds the *Leon* exception applies to the Dog Sniff Warrant.

Under *Leon*, "evidence seized pursuant to a search warrant issued by a [judge] that is later determined to be invalid[] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable."  *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *United States v. Proell*, 485 F.3d 427, 430 (8th

---

[5]    The Government stated in its initial opposition to the Motion to Compel Discovery that the CRI provided the information at issue to Detective Turner in 2014. (Dkt. 53 at 2.)  Williams seized on this assertion, arguing that it pushes the outer limits of how old information can be before it is considered too stale for determining probable cause, also noting that Williams did not move to Minnesota until 2017 and K.L. did not move into the Residence until 2022.  (Dkt. 59 at 9-11.)  The Government, through its counsel, Thomas Calhoun-Lopez, Assistant U.S. Attorney, represented to the Court in its briefing and at the hearing that the 2014 date was a typographical error on his part, and agreed the 2014 date stated in its earlier brief should disregarded.  (*See* Dkt. 61 at 10.) At the hearing, Williams' counsel agreed that the 2014 date from the brief does not matter for purposes of the probable cause analysis because it was not contained in the warrant materials.  The Court will not consider a date stated in a brief and outside of the materials considered by the issuing judge for purposes of the probable cause analysis.

Cir. 2007)).  In *Leon*, the court stated that "searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate [judge] normally suffices to establish that a law enforcement officer has 'acted in good faith in conducting the search."  468 U.S. at 922 (cleaned up).  However, the *Leon* court noted that there are certain instances when "the purpose of the exclusionary rule—deterring police misconduct—will not be served by suppressing illegally seized evidence."  *United States v. Martin*, 833 F.2d 752, 755 (8th Cir. 1987); *Leon*, 468 U.S. at 922-23.  "When a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational reason for suppressing the fruits of the search."  *Martin*, 833 F.2d at 755.  The Court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization."  *Leon*, 468 U.S. at 923 n.23.  The reviewing court should consider the totality of the circumstances, "including any information known to the officer but not included in the affidavit . . . ."  *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted).  The *Leon* exception also applies to staleness.  *See United States v. McNeil*, 184 F.3d 770, 775 (8th Cir. 1999) (citations omitted) (applying *Leon* and finding that "even if the information in the warrant affidavit was impermissibly stale, the warrant was not so facially lacking in probable cause as to preclude the executing officers' good faith reliance thereon").

        In this regard, evidence obtained as a result of an unconstitutional search should be suppressed under the following circumstances:

    i.      when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

    ii.     when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;

    iii.    when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

    iv.    when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431).  With respect to the third exception, the Eighth Circuit has explained: "'Entirely unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in *Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's particularly strong choice of words."  *Proell*, 485 F.3d at 432 (quoting *Carpenter,* 341 F.3d at 670).

Here, the Court, as noted above (*see supra* Section III.B), does not find that the Application was intentionally or recklessly misleading, or that the issuing judge wholly abandoned their judicial role in issuing the search warrants.  It appears that Detective Altendorfer from the Ramsey County Sheriff's Office executed the Dog Sniff Warrant with his K9 partner "Molly."  (Gov't Ex. 2 (Dkt. 39-2 at 4).)  The Court finds that Detective Altendorfer reasonably relied on the court-authorized search warrant.  As to "staleness," the Affidavit states that Detective Turner "recently" spoke with the CRI, whose plain meaning denotes contemporaneously or an event occurring not in the long past from the date of the Affidavit.  In addition, the Affidavit contained the CRI's statements using the present tense to describe Williams' drug trafficking, including that

"CRI stated that 'lil ride' has a 'party house' and a store front in St. Paul that he uses as a front to distribute cocaine and conceal firearms," that the CRI "advised that Williams stores and sells narcotics" out of the "party room," and that Williams "has been selling large quantities of cocaine," which also indicate an ongoing course of drug trafficking rather than a few isolated instances. The Court concludes that a reasonable officer in the position of Detective Altendorfer could believe that the information provided by the corroborated CRI was not stale and afforded a sufficient basis to believe that evidence of an ongoing drug trafficking operation would be found as a result of the dog sniff of the Residence's door.[6] *See United States v. Matthews*, 753 F.3d 1321, 1325-26 (D.C. Cir. 2014) (finding that *Leon* exception applies to an "affidavit, which speaks in the present tense, as well as describing activity relating back over three years, describes an ongoing enterprise in a specified location, not a nomadic one likely to have been moved or recently terminated").

Given that the *Leon* exception applies, the Court recommends denial of the Motion to Suppress with respect to the Dog Sniff Warrant.

**D.    Interior Warrant**

As to the Interior Warrant, Williams initially asserted:

[T]he warrants rise and fall together. The first warrant was for the dog sniff. A judge wrongly granted it because of the disputed sentence about the CRI stating Albert lived at the Brooklyn Park home. Without that sentence, no judge would have granted the warrant, and the sniff wouldn't have occurred.

---

[6]    Given the Court's finding that the Dog Sniff Warrant established probable cause to believe evidence of drug trafficking could be found at the Residence, the Court need not address whether the *Leon* exception applies as to the location.

> So the home warrant would not have had a positive dog sniff as one of the
> probable-cause generating facts.

(Dkt. 44 at 7.)  If the warrants rise and fall together, the Court's recommendation against

suppression as to the Dog Sniff Warrant requires a recommendation against suppression

as to the Interior Warrant.

Later, in his Supplemental Memorandum, Williams generally argues that the

Interior Warrant should be suppressed on staleness grounds.  (*See* Dkt. 59.)  But K9

"Molly" positively alerted for the presence of narcotics at the door of the Residence about

72 hours before law enforcement sought the Interior Warrant.  (Dkt. 39-2 at 4.)

Information obtained within 72 hours of a warrant application "can hardly be deemed

stale information."  *United States v. Carnahan*, 684 F.3d 732, 736 (8th Cir. 2012)

(finding that information about a controlled buy made less than 72 hours before the

warrant application was not stale).

As to probable cause, given the positive result of the dog sniff within 72 hours of

the Affidavit for the Interior Warrant, along with the other information about Williams'

drug trafficking; the CRI's assertions that Williams always has firearms on his person;

the Affidavit's description of Williams as a felon prohibited from possessing firearms;

and Detective Turner's assertions, based on his experience and training, that people who

are involved with narcotics often times use firearms to protect their narcotics and

proceeds, the Court finds that the totality of the circumstances support a finding that there

was a fair probability that narcotics and firearms-related evidence would be located at the

Residence.  The Court recommends denial of the Motion to Suppress as to the Interior Warrant.

## IV.    DISCOVERY MOTIONS (Dkts 50 & 51)[7]

With respect to the Motion to Compel, only two items of discovery are still sought by Williams:

> (4) All drafts of all warrants at issue, including metadata.

> . . .

> (8) All information related to the CRI, including, but not limited to, (1) his/her name and contact information; (2) any audio interviews of the CRI; (3) any transcript of any interviews of the CRI; [and] (4) any rough notes related to interviews of the CRI.

(Dkt. 50.)  The Court addresses these remaining disputes in turn.

### A.    All drafts of all warrants at issue, including metadata

According to Williams, he is entitled to all of the drafts of the Applications and metadata for the Dog Sniff and Interior Warrants under Rule 16(a)(1)(E) of the Federal Rules of Civil Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963).  Williams argues that the drafts are material to his *Franks* challenge, addressed above (*supra,* Section III.B), as to the discrepancy between the Dog Sniff and Interior Applications with respect to the statement that Williams was living at the Residence.  (Dkt. 50 at 14.)  By requiring the Government to produce all drafts of all warrants and warrant affidavits, including

---

[7]    The Court granted the Government's Motion for Discovery at the August 30, 2024 hearing as unopposed.  (Dkt. 64.)  Supplemental briefing on the Motion to Compel was completed on September 27, 2024, making the issue ripe for decision.

metadata, Williams asserts that he and the Court may be able to discern why Detective Turner put the disputed sentence in one Application but not the other. (*Id.*)

Rule 16(a)(1)(E) provides: "the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control." Fed. R. Crim. P. 16(a)(1)(E). Rule 16 only requires the Government to produce information "material to preparing the defense." Fed. R. Crim. P. 16(a)(1)(E)(i). Evidence is material for the purposes of Rule 16 if it is "helpful to the defense." *United States v. Vue*, 13 F.3d 1206, 1208 (8th Cir. 1994) (citations omitted). "A showing of materiality . . ., is not satisfied by a mere conclusory allegation that the requested information is material to the preparation of the defense." *United States v. Krauth*, 769 F.2d 473, 476 (8th Cir. 1985) (marks and citation omitted) (addressing predecessor Rule 16(a)(1)(C)) (citation omitted). Williams bears the burden of showing materiality under Rule 16. *See United States v. Jean*, 891 F.3d 712, 715 (8th Cir. 2018).

Under *Brady v. Maryland*, "suppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. However, "*Brady* is not a discovery rule, but a rule of fairness and minimum prosecutorial obligation." *United States v. Miller*, 698 F.3d 699, 704 (8th Cir. 2012) (quoting *Krauth*, 769 F.2d at 476).

Williams cites to *United States v. Virgen-Nunez*, No. 4:09-CR-16-JEG-RAW, 2009 WL 10678145 (S.D. Iowa June 26, 2009), where he claims the court compelled the Government to provide the defendant with metadata from the computer used to prepare a search warrant application, and *United States v. Valentine*, No. 6:24-CR-44-PGB-EJK, 2024 WL 4099414 (M.D. Fla. Sept. 5, 2024), where he asserts that the court ordered the Government to produce not only drafts and redlines of a search warrant affidavit, but also notes prepared by an agent concerning the preparation of that warrant, communications between the agent and third parties outlining the agent's knowledge about certain items sought by the warrant, and secondary sources the agent consulted.  (Dkt. 65 at 3-4.)

Defendant's reliance on *Virgen-Nunez* is inapposite because the dispute in that case dealt with the timing of when the search warrant was prepared and issued by the judge, for which the metadata was material:

> The metadata provided by the government does tend to confirm when the search warrant application was prepared. Timing in this regard is material to the defense in the sense that the longer it took to prepare and present the search warrant application, the greater the opportunity, and perhaps incentive, for a warrantless search by those waiting at the scene who might become impatient. The degree of materiality is not very high, but with the question of timing unclear the Court believes the better part of discretion is to grant the motion to compel with respect to the metadata. As far as the Court can tell the content of the metadata, a one-page "screen capture" indicating the date the document was created, does not contain any information which would be prejudicial to any law enforcement interest of the government.

2009 WL 10678145, at *2.  While the Court agrees that metadata might be useful with respect to the timing of a warrant, here the question is not the timing of the warrants, but the "why" with respect to the omission of the assertion that Williams lived at the

Residence in the Affidavit in support of the Interior Warrant. Williams has not explained how the metadata will help explain that omission. Regardless, Williams' reliance on Rule 16 suffers from a lack of materiality to his defense as to the warrant drafts and metadata since the Court has found adequate probable cause existed to issue the Dog Sniff Warrant even removing the statement that Williams lived at the Residence. As such, the Court finds that Williams has not met his burden to show the materiality of the warrant metadata and copies of the warrants for the purposes of production under Rule 16.

In *Valentine*, the defendant raised the possibility that alleged child pornography referenced in a search warrant might not in fact be criminal in nature. 2024 WL 4099414 at *1, 3. The defendant requested that the Government produce discovery of the case agent's work product, including drafts of the search warrant affidavit, notes concerning the preparation and content of the affidavit, communications between the agent and other government officials regarding the six images discussed in the affidavit, and secondary sources the agent may have consulted while drafting the warrant. *Id.* at *2. The *Valentine* court recognized the difficulty of the production under Rule 16 given the protections afforded by Rule 16(a)(2). *Id.* at *3. Indeed, Rule 16(a)(2) provides that "this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Fed. R. Crim. P. 16(a)(2). As explained by a court in this District:

> [T]he Supreme Court concluded that "a defendant may examine documents material to his defense, but, under Rule 16(a)(2), he may not examine Government work product." *United States v. Armstrong,* 517 U.S. 456, 463 (1996). Applying this principle, this Court held in *United States v. Wirth,* that the Government's rough notes and draft summaries were not subject to disclosure because the documents were "work product" under Rule 16(a)(2). *United States v. Wirth, et al.,* No. 11–cr–256 (ADM/JJK), 2012 WL 1580991, at *1 (D. Minn. May 4, 2012).

*United States v. Meadows*, No. 14-CR-251 SRN/JSM, 2014 WL 6684977, at *4 (D. Minn. Nov. 25, 2014) (citation omitted).

The Court acknowledges that the *Valentine* Court ordered an *in camera* inspection of the warrant-related information under *Brady* in support of evidence for bringing a possible *Franks* challenge.  However, as noted previously, the Eighth Circuit has explicitly found that *Brady* is not a rule of discovery.  *See Miller*, 698 F.3d at 704.  "The rule of *Brady* is limited to the discovery, after trial, of information which had been known to the prosecution but unknown to the defense."  *Nassar v. Sissel*, 792 F.2d 119, 121 (8th Cir. 1986) (citing *United States v. Agurs,* 427 U.S. 97, 103349 (1976)).

Moreover, while Williams attempts to characterize the Application drafts as ordinary work product (Dkt. 65 at 7), drafts of affidavits are considered opinion work product that are entitled to absolute protection from disclosure.  *See United States v. Two Bank Accts. Described as: Bank Acct. in the Amount of $197,524.99, Bank of Am., Seattle, Wash.*, No. CIV. 06-4005, 2007 WL 108392, at *7 (D.S.D. Jan. 5, 2007) ("Agent Miller's draft affidavit is opinion work product and is entitled to absolute protection from disclosure.") (citing *Baker v. General Motors Corp.,* 209 F.3d 1051, 1054. (8th Cir. 2000)) (citation omitted); *see also United States v. Wirth*, No. CRIM. 11-256 ADM/JJK,

2012 WL 1110540, at *3 (D. Minn. Apr. 3, 2012) ("Nonetheless, the consensus is that *Brady* mandates disclosure of exculpatory evidence notwithstanding the work-product doctrine, except where work product is solely mental impressions, conclusions, or legal theories, i.e. so-called opinion work product.") (citation and marks omitted).

For all of these reasons, the Motion for Discovery is denied. That said, the Court reminds the Government of its ongoing obligations under *Brady*.

## B.    Information Relating to the CRI

Williams moves for an Order directing the Government to disclose: the CRI's name and contact information; (2) any audio interviews of the CRI; (3) any transcript of any interviews of the CRI; and (4) any rough notes related to interviews of the CRI. The basis for this Motion is that the disclosure of the identity of the confidential informant is material to the discrepancy between the Dog Sniff and Interior Warrant Affidavits and his relief requested under *Franks*. (Dkt. 50 at 3-12.)

The Government has a general, although not absolute, "privilege to withhold the disclosure of the identity of a confidential informant." *Carpenter v. Lock*, 257 F.3d 775, 779 (8th Cir. 2001) (citing *Roviaro v. United States*, 353 U.S. 53 (1957)). When deciding whether to disclose information about an informant, a court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro*, 353 U.S. at 62. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61. The essential consideration when deciding whether evidence is relevant and helpful

to the defense is "whether or not the evidence is material to the accused's defense or a fair determination of the cause." *United States v. Barnes*, 486 F.2d 776, 778 (8th Cir. 1973); *Carpenter*, 257 F.3d at 779 ("[T]he threshold issue is whether the informant is a material witness.") (citation omitted).

"Where the witness is an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense." *Devose v. Norris*, 53 F.3d 201, 206 (8th Cir. 1995) (citation and footnote omitted); *see also United States v. Foster*, 815 F.2d 1200, 1203 (8th Cir. 1987) (citation omitted) ("The disclosure of an informant who was an active participant in the crime the accused is charged with is generally required.").  This is in contrast to "cases involving 'tipsters' who merely convey information to the government but neither witness nor participate in the offense, disclosure is generally not material to the outcome of the case and is therefore not required." *United States v. Harrington*, 951 F.2d 876, 878 (8th Cir. 1991) (citing *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987)); *see also United States v. Lapsley*, 334 F.3d 762, 764 (8th Cir. 2003) ("Consequently, disclosure is typically not required when the informant merely conveys information to the government but neither witnesses nor participates in the offense.") (quotation marks and citations omitted).  A CRI whose statements are relied upon for search warrants at issue in this case can also be material even to the extent that the Government does not intend to call these witnesses at trial.  *See United States v. Abari*, No. 19-CR-103 (MJD/ECW), 2020 WL 1983732, at *4 (D. Minn. Apr. 27, 2020).

However, given that the Court has rejected the *Franks* challenge with respect to the warrants and Williams based his materiality argument on the removal of the statement that Williams lives at the Residence from the Interior Warrant's Affidavit and his *Franks* challenge, the Court denies the Motion seeking the identity of the CRI and related discovery.

## V.    ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT:**

1.    The Government's Motion for Discovery (Dkt. 15) is **GRANTED** as unopposed;

2.    Defendant Albert James Williams' request for a *Franks* Hearing in the Motion to Suppress (Dkt. 38) is **DENIED**; and

3.    Defendant's Motion to Compel (Dkts. 50 & 51) is **DENIED**.

## VI.    RECOMMENDATION

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED THAT:** Defendant Albert James Williams' Motion to Suppress (Dkt. 38) be **DENIED**.

DATED: October 28, 2024                    *s/Elizabeth Cowan Wright*
                                           ELIZABETH COWAN WRIGHT
                                           United States Magistrate Judge

## **NOTICE**

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).